# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
No. 19-1535V
UNPUBLISHED

| | |
|---|---|
| JANET NIEMI,<br><br>                 Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                 Respondent. | Chief Special Master Corcoran<br><br>Filed: July 5, 2022<br><br>Special Processing Unit (SPU); Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*David Carney*, Green & Schafle LLC, Philadelphia, PA, for Petitioner.

*Camille Collett*, U.S. Department of Justice, Washington, DC, for Respondent.

### DECISION AWARDING DAMAGES[1]

On October 2, 2019, Janet Niemi filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a left shoulder injury related to vaccine administration (SIRVA) after receiving an influenza ("flu") vaccination on January 16, 2019, and subsequently suffered a left shoulder injury related to vaccine administration (SIRVA). Petition at 1-2. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$75,810.00**, **representing $75,000.00 for actual pain and suffering and $810.00 for past unreimbursable expenses.**

### I.  Relevant Procedural History

Respondent initially opposed compensation in this case, taking the position that "the medical records do not establish that [P]etitioner suffered the first symptoms or manifestation of onset of a shoulder injury within 48 hours of the January 16, 2019 flu vaccination." ECF 28 at 7. After allowing the parties to brief this issue, I issued a ruling on entitlement, finding that the onset of Petitioner's pain occurred within 48 hours of vaccination and that Petitioner's injury otherwise met all requirements for a Table SIRVA. ECF 38. One month later, the parties reported an impasse on the issues of Petitioner's pain and suffering and her past unreimbursable expenses. ECF 41. Both parties have been provided the opportunity to brief the issue of Petitioner's damages, and this matter is now ripe for adjudication.

### II.  Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4).

Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which the petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (citing *McAllister v. Sec'y of Health*

*& Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with that of my predecessor Chief Special Masters) adjudicating similar claims.[3] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. In *Graves*, Judge Merow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579 (Fed. Cl. 2013). Judge Merow maintained that do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id*. at 593-95. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

### III.     Prior SIRVA Compensation Within SPU[4]

#### A.     Data Regarding Compensation in SPU SIRVA Cases

SIRVA cases have an extensive history of informal resolution within the SPU. As of January 1, 2022, 2,371 SPU SIRVA cases have resolved since the inception of SPU

---

[3] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[4] All figures included in this decision are derived from a review of the decisions awarding compensation within the SPU. All decisions reviewed are, or will be, available publicly. All figures and calculations cited are approximate.

on July 1, 2014. Compensation was awarded in 2,306 of these cases, with the remaining 65 cases dismissed.

Of the compensated cases, 1,339 SPU SIRVA cases involved a prior ruling that petitioner was entitled to compensation. In only 88 of these cases was the amount of damages determined by a special master in a reasoned decision. As I have previously stated, the written decisions setting forth such determinations, prepared by neutral judicial officers (the special masters themselves), provide the most reliable precedent setting forth what similarly-situated claimants should also receive.[5]

1,223 of this subset of post-entitlement determination, compensation-awarding cases, were the product of informal settlement - cases via proffer and 28 cases via stipulation. Although all proposed amounts denote an agreement reached by the parties, those presented by stipulation derive more from compromise than any formal agreement or acknowledgment by Respondent that the settlement sum itself is a fair measure of damages. Of course, even though *any* such informally-resolved case must still be approved by a special master, these determinations do not provide the same judicial guidance or insight obtained from a reasoned decision. But given the aggregate number of such cases, these determinations nevertheless "provide *some* evidence of the kinds of awards received overall in comparable cases." *Sakovits,* 2020 WL 3729420, at *4 (emphasis in original).

The remaining 967 compensated SIRVA cases were resolved via stipulated agreement of the parties without a prior ruling on entitlement. These agreements are often described as "litigative risk" settlements, and thus represent a reduced percentage of the compensation which otherwise would be awarded. Due to the complexity of these settlement discussions, many which involve multiple competing factors, these awards do not constitute a reliable gauge of the appropriate amount of compensation to be awarded in other SPU SIRVA cases.

The data for all groups described above reflect the expected differences in outcome, summarized as follows:

---

[5] *See, e.g., Sakovits v. Sec'y of Health & Hum. Servs.*, No. 17-1028V, 2020 WL 3729420, at *4 (Fed. Cl. Spec. Mstr. June 4, 2020) (discussing the difference between cases in which damages are agreed upon by the parties and cases in which damages are determined by a special master).

4

|  | Damages Decisions by Special Master | Proffered Damages | Stipulated Damages | Stipulated[6] Agreement |
|---|---|---|---|---|
| **Total Cases** | *88* | *1,223* | *28* | *967* |
| **Lowest** | $40,757.91 | $25,000.00 | $45,000.00 | $5,000.00 |
| **1st Quartile** | $70,950.73 | $70,000.00 | $90,000.00 | $42,500.00 |
| **Median** | **$95,974.09** | **$90,000.00** | **$122,886.42** | **$60,390.00** |
| **3rd Quartile** | $125,269.46 | $116,662.57 | $161,001.79 | $88,051.88 |
| **Largest** | $265,034.87 | $1,845,047.00 | $1,500,000.00 | $550,000.00 |

### B. Pain and Suffering Awards in Reasoned Decisions

In the 88 SPU SIRVA cases which required a reasoned damages decision, compensation for a petitioner's actual or past pain and suffering varied from $40,000.00 to $210,000.00, with $94,000.00 as the median amount. Only five of these cases involved an award for future pain and suffering, with yearly awards ranging from $250.00 to $1,500.00.[7]

In cases with lower awards for past pain and suffering, many petitioners commonly demonstrated only mild to moderate levels of pain throughout their injury course. This lack of significant pain is often evidenced by a delay in seeking treatment – over six months in one case. In cases with more significant initial pain, petitioners experienced this greater pain for three months or less. All petitioners displayed only mild to moderate limitations in range of motion ("ROM"), and MRI imaging showed evidence of mild to moderate pathologies such as tendinosis, bursitis, or edema. Many petitioners suffered from unrelated conditions to which a portion of their pain and suffering could be attributed. These SIRVAs usually resolved after one to two cortisone injections and two months or less of physical therapy ("PT"). None required surgery. The duration of the injury ranged from six to 30 months, with most petitioners averaging approximately nine months of pain. Although some petitioners asserted residual pain, the prognosis in these cases was positive. Only one petitioner provided evidence of an ongoing SIRVA, and it was expected to resolve within the subsequent year.

Cases with higher awards for past pain and suffering involved petitioners who suffered more significant levels of pain and SIRVAs of longer duration. Most of these petitioners subjectively rated their pain within the upper half of a ten-point pain scale and

---

[6] Two awards were for an annuity only, the exact amounts which were not determined at the time of judgment.

[7] Additionally, a first-year future pain and suffering award of $10,000.00 was made in one case. *Dhanoa v. Sec'y of Health & Hum. Servs.*, No. 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018).

sought treatment of their SIRVAs more immediately, often within 30 days of vaccination. All experienced moderate to severe limitations in range of motion. MRI imaging showed more significant findings, with the majority showing evidence of partial tearing. Surgery or significant conservative treatment, up to 95 PT sessions over a duration of more than two years and multiple cortisone injections, was required in these cases. In four cases, petitioners provided sufficient evidence of permanent injuries to warrant yearly compensation for future or projected pain and suffering.

### IV. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, awareness of the injury is not disputed. The record reflects that Petitioner is a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury.

In performing this analysis, I have reviewed the record as a whole, including all medical records and affidavits filed, as well as the parties' briefs and other pleadings. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and rely upon my experience adjudicating these cases. However, I have based my ultimate determination on the specific circumstances of this case.

#### A. The Parties' Arguments

In arguing that she should be awarded $90,000.00 for her pain and suffering, Petitioner compares the facts and circumstances in her case favorably with the experiences of the petitioners in *Danielson*, *Dhanoa*, *Gentile*, *Kent*, and *Weber*.[8] ECF 31 at 21-25. Petitioner emphasizes the similarities between these cases and hers with regard to delay in seeking treatment, number of physical therapy sessions and steroid injections, MRI findings, and reported pain level. *Id*.

Characterizing Petitioner's injury as comparatively minor, requiring only conservative treatment, Respondent argues in reaction that Petitioner should receive the lesser sum of $62,500.00 for her pain and suffering. ECF 43 at 2. Respondent maintains that the facts of Petitioner's case are more comparable to those in *Murray* and *Edens*, cases where the petitioners received similar treatment to Petitioner but whose symptoms

---

[8] *Danielson v. Sec'y of Health & Human Servs.*, No. 18-1878V, 2020 WL 8271642 (Fed. Cl. Spec. Mstr. Dec. 29, 2020 (awarding $110,000.00 for past pain and suffering); *Dhanoa v. Sec'y of Health & Human Servs.*, No 15-1011V, 2018 WL 1221922 (Fed. Cl. Spec. Mstr. Feb. 1, 2018) (awarding $85,000.00 for actual pain and suffering); *Gentile v. Sec'y of Health & Human Servs.*, No. 16-980V, 2020 WL 3618909 (Fed. Cl. Spec. Mstr. June 5, 2020) (awarding $85,000.00 for actual pain and suffering); *Kent v. Sec'y of Health & Human Servs.*, No 17-0073V, 2019 WL 5579493 (Fed. Cl. Spec. Mstr. Aug. 7, 2019) (awarding $80,000.00 for actual pain and suffering); *Weber v. Sec'y of Health & Human Servs.*, No. 17-399V, 2019 WL 2521540 (Fed. Cl. Spec. Mstr. Apr. 9, 2019) (awarding $85,000.00 for past pain and suffering).

resolved more quickly.[9] *Id*. at 13-14.

### B. Analysis

The guidance provided by the *Graves* decision is clear (although not controlling),[10] and I have previously addressed the more general arguments about calculation of pain and suffering damages made by Respondent during expedited "Motions Day" hearings and in other damages decisions. I have specifically rejected Respondent's argument "that the amounts awarded in proffered cases are a more accurate gauge of the appropriate amount to be awarded than reasoned decisions from the court and special masters." *Sakovits*, 2020 WL 3729420, at *4.

#### 1. The Duration and Severity of Petitioner's SIRVA Injury

Petitioner, a substitute teacher, received a flu vaccine in her left shoulder at Walgreens Pharmacy on January 16, 2019. Ex 1 at 3. Forty-eight days after vaccination, she presented to her primary care provider (PCP) with complaints of pain and decreased range of motion "since" receiving her flu shot. Ex 3 at 51. Petitioner rated her pain as 8/10, and physical examination revealed decreased range of motion. *Id*. 52-53. She was prescribed prednisone and referred to an orthopedist.[11] *Id*. at 53.

Two weeks later, on March 20, 2019, Petitioner visited Dr. Daniel Bauk, an orthopedist at Southern Maryland Orthopaedic (SMO). At that time, Petitioner reported minimal to no pain at rest, but stated that she experienced "deep pain" with movement. Ex 5 at 8. Physical examination revealed mild diffuse tenderness to palpation and pain with range of motion, but good strength in the left shoulder, and Dr. Bauk diagnosed Petitioner with adhesive capsulitis and referred Petitioner to physical therapy. *Id*. at 9.

At her initial physical therapy evaluation on April 11, 2019, Petitioner had equal active range of motion in both her left and right shoulders; however, she had decreased passive range of motion in the left shoulder compared to her right. Ex 9 at 12. She also displayed normal strength. *Id*. At a follow-up appointment with Mark Musket, a physician assistant at SMO on May 1, 2019, Petitioner continued to display "good strength" but decreased range of motion. Ex 5 at 7. PA Musket administered a steroid injection at this

---

[9] *Murray v. Sec'y of Health & Human Servs.*, No. 18-534V, 2020 WL 4522483 (Fed. Cl. Spec. Mstr. July 6, 2020) (awarding $65,000.00 for actual pain and suffering); *Edens v. Sec'y of Health & Human Servs.*, No. 19-1110V, 2021 WL 2182720 (Fed. Cl. Spec. Mstr. Apr. 26, 2021) (awarding $70,000.00 for past pain and suffering).

[10] *See supra* Section II (for further discussion).

[11] Petitioner was prescribed prednisone to treat her asthmatic bronchitis. But her PCP advised that the medication could potentially also reduce the pain and inflammation in her shoulder. Ex 3 at 53.

7

visit, and within a month Petitioner showed "great improvement" in her range of motion. *Id*. at 5.

On August 14, 2019, Petitioner returned to PA Musket with complaints of continued pain with range of motion. Ex 6 at 4. During physical examination, Petitioner did report pain with apprehension testing and forward elevation; however, she had "near comparable" range of motion in the left shoulder compared to the right. *Id*. at 5. PA Musket referred Petitioner to Dr. Peter Johnston, a shoulder specialist at SMO. At her first appointment with Dr. Johnston, on September 13, 2019, Petitioner continued to display "good" strength, but she did have decreased range of motion in all planes. Ex 8 at 5. Dr. Johnston administered a second steroid injection, with Petitioner again reporting good pain relief after the procedure. *Id*.; Ex 16 at 15. At two subsequent appointments with Dr. Johnston, Petitioner continued to complain of pain with range of motion testing; however, as of December 27, 2019, her range of motion was described as "good." Ex 11 at 5-6; Ex 16 at 15. Dr. Johnston also administered a third steroid injection on this date. Ex 11 at 6.

While Petitioner continued to report "lingering pain" in her left shoulder during a January 2020 visit with her PCP, she also stated that she was "much improved" with "better" range of motion, and physical examination revealed normal findings. Ex 17 at 531, 535. Four months later, Petitioner returned to Dr. Johnston, at which time she reported she was at 85% of her prior functioning and rated her pain as 2/10, while physical examination revealed decreased range of motion in all planes and 4+/5 supraspinatus strength. Ex 12 at 8-9.

Due to Petitioner's continued symptoms, Dr. Johnston ordered an MRI of the left shoulder, which was interpreted by the radiologist as showing moderate AC joint hypertrophic changes/arthrosis and mild rotator cuff tendinopathy, but no significant tendinitis or adhesive capsulitis, no rotator cuff tear, and no labral tear or effusion.[12] Ex 16 at 20. While Petitioner did report some difficulty with range of motion at an appointment with Dr. Johnston in June 2020, by August 2020 she stated that she was "minimally symptomatic" and "overall fairly satisfied with her shoulder." Ex 12 at 6-7, 13; Ex 16 at 7. Physical examinations also continued to show improvement in range of motion and strength. Ex 12 at 7, 13; Ex 16 at 8. After her August 2020 visit with Dr. Johnston, Petitioner did not receive any additional care for her shoulder for more than a year, when, in October 2021, she had one virtual visit with a primary care nurse practitioner, at which time she reported intermittent pain and decreased range of motion in her left shoulder and requested a referral to physical therapy. Ex 17 at 44-45. No subsequent records have been submitted.

---

[12] In his treatment notes, Dr. Johnston interpreted the MRI images as showing "what looks like a leading edge full-thickness tear [and] rotator cuff tendinopathy." Ex 12 at 7, 13.

In her initial affidavit, dated August 16, 2019, Petitioner alleged that the pain caused by her shoulder injury interfered with her sleep and activities of daily living (ADLs). Ex 2 at ¶¶ 7, 16. She also reported difficulty socializing due to her pain level. *Id*. at ¶ 20. In a supplemental affidavit dated May 21, 2021, Petitioner stated that her condition has not changed since her last visit with Dr. Johnston in August 2020. Ex 15 at ¶ 9. Petitioner further alleged that she continues to experience residual shoulder pain, which she rated as 3/10 at the worst, when driving, reaching behind her back, and performing ADLs. *Id*. at ¶¶ 4, 6, 10. She has also had to "adjust most aspects of daily life" to "accommodate for the limited mobility in [her] shoulder" and continues to have difficulty socializing. *Id*. at ¶ 5, 7.

### 2. Comparison to Other Awards

The question in this case is not whether Petitioner is entitled to *any* compensation for her pain and suffering, but rather *what* amount of compensation is justified, based upon the facts of the case and considered relevant input. This determination is not an exact science but more of an art. While it is tempting to "split the difference" and award an amount halfway between the amounts proposed by the parties (acknowledging that in this case, the parties' respective positions reasonably "frame" high and low potential awards), each petitioner deserves an examination of the specific facts in his or her case. Thus, while amounts ultimately awarded may end up falling somewhere in the range between the awards proposed by both parties, this result flows from a specific analysis of Ms. Niemi's personal circumstances.

Overall, the record establishes that Petitioner received the type of conservative treatment generally seen in cases featuring mild to moderate SIRVA injuries. While she does report continued shoulder pain, Petitioner described herself as "minimally symptomatic" 15 months after vaccination. Ex 12 at 7, 13. She stopped receiving active treatment approximately 18 months after vaccination and has complained of shoulder pain at only one medical visit that date. Ex 17. In contrast, the petitioners in *Danielson*, *Gentile*, and *Dhanoa*, who also delayed seeking treatment, received multiple steroid injections, and attended a similar number of physical therapy sessions as Petitioner, had evidence demonstrating the persistence of their pain three to five years after vaccination.[13]

Furthermore, while the petitioner in *Kent* also delayed seeking treatment, this was attributed in part because to her status as a Medicaid recipient (i.e., she had difficulty finding an orthopedic surgeon who would accept her insurance). Whereas the petitioner

---

[13] *Danielson*, 2020 WL 8271642, at 4-5; *Gentile*, 2020 WL 3618909, at *13; *Dhanoa*, 2018 WL 1221922, at *6.

9

in *Kent* did not have her first visit with an orthopedist until almost five months after vaccination, at which time she had "profoundly limited active and passive range of motion,[14] Petitioner had completed 22 physical therapy sessions within that same timeframe and was rating her pain as 1/10 at best. Ex 9 at 56, 61. Finally, while Petitioner has accurately characterized the treatment received by the petitioner in *Weber* as conservative, the amount awarded for pain and suffering included consideration of the petitioner's difficulty caring for her newborn and pursuing her hobbies due to her SIRVA, as well as the fact that she was in the midst of recovering from a non-vaccine related injury in her opposite shoulder,[15] unique factors that are not present in the current case.

The facts of *Edens*, one of the cases cited by Respondent, are also insufficiently similar to serve as an appropriate comparison. *Murray*, however, does provide some useful guidance. The petitioner in *Murray* underwent three injections (two steroid and one lidocaine), attended 15 physical therapy and 22 chiropractic sessions, and was prescribed narcotic pain medication,[16] with substantial resolution of her symptoms within 12 months.[17] It thus is somewhat comparable to the present facts. But I did note in awarding damages therein that "not all of [the petitioner's symptoms] appear[] to have been the result of the SIRVA injury," and thus the case was "distinguishable from the kind of petitioner whose injury occurs without any prior or recent ongoing medical problems." *Murray*, at *4. Ms. Niemi did not have any additional medical conditions, suggesting that a slightly higher award to that in *Murray* is appropriate. Therefore, I find that $75,000.00 for past pain and suffering is appropriate compensation in this case.

### V.     Appropriate Compensation for Past Unreimbursable Expenses

The majority of Petitioner's medical expenses were covered by her private health insurance. However, she incurred a $30.00 per visit copay for 27 medical visits, for a total of $810.00. ECF 31 at 25. Respondent proposes to award only $780.00, arguing that Petitioner has not provided evidence to substantiate that one visit (on October 25, 2019) was related to her vaccine injury. ECF 43 at 7.

Section 15(a)(1)(A) of the Act provides that a petitioner be awarded past expenses related to the "diagnosis and medical or other remedial care determined to be reasonably

---

[14] *Kent*, 2019 WL 5579493, at *3.

[15] *Weber*, 2019 WL 2521540, at *3-4.

[16] In her initial affidavit, Petitioner alleged that she is "unable to take any painkillers" because she works with children. Ex 2 at ¶ 19. However, there is no indication in the record that anything other than NSAIDs/steroids were ever discussed with a treatment provider.

[17] *Murray*, 2020 WL 4522483, at *1-2.

necessary," or "for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary." 42 U.S.C. § 300aa-15(a)(1)(A).

Petitioner has provided an explanation of benefits statement reflecting a copay of $30.00 for a visit at SMO[18] on October 25, 2019. ECF 31 at 44. Furthermore, a review of Petitioner's medical records shows that she was evaluated and treated by Dr. Johnston, her shoulder specialist at SMO, on this date. Ex 16 at 15-16. This substantiates Petitioner's claim that this expense was incurred for the medical care of her vaccine-related injury. Therefore, I find that Petitioner is entitled to an award of $810.00 for actual unreimbursable expenses.

## VI.   Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $75,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[19] I also find that Petitioner is entitled to $810.00 in actual unreimbursable expenses.**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $75,810.00 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[20]

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master

---

[18] Also referred to in some records as the Centers for Advanced Orthopaedics, LLC. *See* Ex 2 at ¶ 22.

[19] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[20] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.